ROSS, Appellant,

v.

NAPPIER, Appellee, et al.

[Cite as *Ross v. Nappier*, 185 Ohio App.3d 548, 2009-Ohio-6995.]

Court of Appeals of Ohio,
Eleventh District, Geauga County.

No. 2008–G–2871.

Decided Dec. 31, 2009.

James T. Schumacher, L.L.C., and James T. Schumacher, for appellant.

Christopher J. Ankuda, for appellee.

---

MARY JANE TRAPP, Presiding Judge.

{¶ 1} Appellant, Gilbert Ross, appeals the judgment entered by the Geauga County Court of Common Pleas. Following a jury trial, the trial court confirmed a verdict in the amount of $17,100 in favor of Ross and against appellee, Kristen Nappier. In addition, the trial court entered judgment in favor of the Cincinnati Insurance Company on Ross's claim for underinsured-motorist coverage.[1]

{¶ 2} This case concerns the admission of evidence of the Bureau of Workers' Compensation's statutory right of subrogation arising from past and anticipated future payments and medical payments, as well as a permanent partial award made on behalf of Ross. In this action against the tortfeasor, Nappier, the trial court granted Nappier's motion in limine and excluded that evidence.

{¶ 3} Faced with a record that was saturated with evidence offered by both parties regarding workers' compensation benefits and the Supreme Court of Ohio's perplexing decision in *Robinson v. Bates,* 112 Ohio St.3d 17, 2006-Ohio-6362, 857 N.E.2d 1195, paragraph two of the syllabus, which held that amounts charged by medical-care providers that are written off are not collateral benefits

---

1. Cincinnati has not filed an appellate brief, nor is it otherwise actively participating in this appeal.

and are thus admissible, the trial court and counsel were presented with a Hobson's choice in a case where it is impossible to hide from the jury the fact that the plaintiff was covered by a collateral benefit. What evidence is admissible and necessary for a jury to fully and properly determine damages in this case without running afoul of both the collateral-benefit rule and the holding in *Robinson*? The jury learned that Ross received workers' compensation benefits and that the bureau paid an amount less than the medical providers billed; however, it was not informed of Ross's statutory obligation to repay those amounts. We believe that the trial court erred in excluding the subrogation testimony, as its exclusion denied Ross the opportunity to be made whole. *Pryor v. Webber* (1970), 23 Ohio St.2d 104, 52 O.O.2d 395, 263 N.E.2d 235.

{¶ 4} Ross worked for NAPA Auto Parts, and on March 31, 2005, he was operating a NAPA pickup truck in the course and scope of his employment, traveling east on Washington Street in Bainbridge, Ohio. As Ross approached the intersection of Haskins Road and Washington Street, Nappier, traveling south on Haskins Road, attempted to cross Washington Street. Ross, who had the right-of-way, was unable to avoid Nappier's vehicle, and her vehicle collided with the truck driven by Ross. Ross's vehicle spun out of control and struck a utility pole. The utility pole was severed as a result of the collision and came to rest on Ross's truck.

{¶ 5} Ross was removed from his vehicle by paramedics and transported to the hospital. As a result of the accident, Ross suffered several injuries, including a contusion to his head and a cervical/thoracic/lumbar sprain, with headaches and radicular symptoms bilaterally. At the hospital, Ross was treated and released.

{¶ 6} The next day, Ross was still experiencing pain, so he sought treatment at an urgent-care facility. The doctors gave Ross pain medication and advised him to follow up with his family doctor.

{¶ 7} Ross sought treatment by Dr. Timothy Morley. The jury heard the videotaped deposition of Dr. Morley, in which he testified that the "overwhelming majority," approximately 90 percent, of his medical practice is related to patients making workers' compensation claims. Dr. Morley treated Ross by ordering precautionary diagnostic tests, prescribing medications, and ordering physical therapy.

{¶ 8} Since Ross was in the course and scope of his employment at the time of the accident, he received workers' compensation benefits. The bureau paid medical compensation in the amount of $12,057.80. In addition, the bureau paid $5,709.90 in other compensation. Finally, the bureau estimated that it would pay an additional $3,000 in medical compensation on behalf of Ross.

{¶ 9} On March 22, 2007, Ross filed suit against Nappier, Cincinnati Insurance Company, and Mary Joan Walker.[2]   Nappier filed an answer to the complaint, generally denying the allegations.  Before trial, Nappier filed a motion in limine, asking the court to exclude evidence "from a Bureau of Workers' Compensation representative which suggests that [Ross] will be required to re-pay the Bureau for any monies paid by the Bureau with regard to [Ross's] claims."  The motion was opposed by Ross. The trial court granted Nappier's motion in limine and stated that it would "not permit testimony regarding subrogation."

{¶ 10} The jury heard the testimony of Ross, his wife, and a paramedic firefighter with the Bainbridge Fire Department who responded to the scene of the accident, in addition to Dr. Morley's deposition.

{¶ 11} Ross also introduced several exhibits.  Two of these exhibits concerned payments from the bureau.  Plaintiff's Exhibit 3, entitled "OBWC—Data Warehouse, Detailed HPP Medical Billing History of Claim," itemized all paid medical-expense claims submitted to and paid by the bureau on behalf of Ross. Plaintiff's Exhibit 5, entitled "OBWC—Data Warehouse—Detailed MIIS Billing History for Claim," itemized payments for prescription drugs that the bureau made on behalf of Ross. The trial court admitted plaintiff's Exhibits 3 and 5.

{¶ 12} Ross proffered Exhibit 4, entitled "subrogation interest worksheet." This document summarized the amounts the bureau paid to Ross or his medical providers, including medical compensation in the amount of $12,057.80 and compensation in the amount of $5,709.90.[3]   Also, the subrogation worksheet included estimated future medical compensation in the amount of $3,000.   In addition, Ross proffered a summary of the expected testimony of bureau attorney Holly Leuchtag regarding Exhibit 4, relating to Ross's statutory obligation to repay the bureau in an amount determined by a prescribed formula.

{¶ 13} At trial, the parties stipulated that the reasonable value of Ross's medical expenses was $12,057.80, and the trial court so instructed the jury. However, during closing argument, defense counsel submitted that the jury's verdict should be $18,100, arguing that one-third of the medical bills, or $6,000, was reasonable and should be added to $12,000 for pain, suffering, and inconvenience and $100 for damaged clothing.  The jury returned a verdict in favor of Ross in the amount of $17,100.  The trial court confirmed the verdict and entered judgment against Nappier and in favor of Ross in the sum of $17,100.

{¶ 14} Ross raises the following assignment of error:

---

2.  Walker allegedly owned the vehicle that was operated by Nappier.  The claims against Walker were dismissed at the trial-court level, and she is not a party to this appeal.

3.  Apparently, the figure $5,709.90 represents the permanent partial award paid by the bureau.

{¶ 15} "The Trial Court erred by precluding any evidence of the existence of a subrogation claim by the Bureau of Workers' Compensation pursuant to Ohio Revised Code §§ 4123.93 and 4123.931, by its in chambers ruling on Defendant's Motion in Limine (R. 56), evidence of which was proffered at Trial * * *."

{¶ 16} **Standard of Review**

{¶ 17} A trial court's ruling on a motion in limine is left to the sound discretion of the trial court. *In re Funk*, 11th Dist. Nos. 2002–P–0035 and 2002–P–0036, 2002-Ohio-4958, 2002 WL 31107531, at ¶ 20, citing *Harman Group Corporate Fin., Inc. v. Academy of Medicine of Columbus & Franklin Cty.* (1994), 94 Ohio App.3d 712, 721, 641 N.E.2d 785. Thus, a reviewing court will not reverse a trial court's ruling on a motion in limine absent an abuse of discretion. Id., citing *Dubecky v. Horvitz Co.* (1990), 64 Ohio App.3d 726, 742, 582 N.E.2d 1087. " 'The term "abuse of discretion" connotes more than an error of law or of judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable.' " *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 450 N.E.2d 1140, quoting *State v. Adams* (1980), 62 Ohio St.2d 151, 157, 16 O.O.3d 169, 404 N.E.2d 144.

{¶ 18} **Proffer Requirement**

{¶ 19} A motion in limine is a preliminary request for the trial court to exclude certain evidence. See, e.g., *Stevens v. Provitt*, 11th Dist. No. 2002–T–0076, 2003-Ohio-7226, 2003 WL 23097088, at ¶ 38. Accordingly, "[a] party who has been restricted from introducing evidence by means of a motion in limine must seek to introduce the evidence by proffer or otherwise at trial to preserve the issue on appeal." *Hores v. Weaver*, 11th Dist. Nos. 2004–T–0045, 2004–T–0047, and 2004–T–0048, 2005-Ohio-6076, 2005 WL 3047498, at ¶ 23, citing *Collins v. Storer Communications, Inc.* (1989), 65 Ohio App.3d 443, 446, 584 N.E.2d 766. This is because "a proffer assists a reviewing court when determining whether the trial court's exclusion of evidence affected a substantial right of the appellant as required by Evid.R. 103." *In re Byerly*, 11th Dist. Nos. 2001–P–0158 and 2001–P–0159, 2004-Ohio-523, 2004 WL 231804, at ¶ 24.

{¶ 20} In this matter, Ross proffered Exhibit 4, the subrogation-interest worksheet. In addition, Ross's counsel summarized the proposed testimony of bureau attorney Leuchtag: [4]

{¶ 21} "Basically what Holly Leuchtag was going to testify to was the interaction of the subrogation statute. And specifically she was going to discuss

---

4. A summary of the proposed testimony is a permitted method to proffer testimony. See, e.g., *Ross v. St. Elizabeth Health Ctr.*, 181 Ohio App.3d 710, 2009-Ohio-1506, 910 N.E.2d 1047, at ¶ 28, citing *State v. Heinish* (1990), 50 Ohio St.3d 231, 241, 553 N.E.2d 1026.

the figures in Plaintiff's Exhibit 4 being compensation pay; that's the permanent partial at $5,709 and 90 cents. Medical paid, that's the bills, it's $12,057 and 80 cents which is actually going to come in anyway as a matter of stipulated amount. She was going to testify as to the medical compensation of the $3,000 involved in future compensation.

{¶ 22} "And all of that was to be done pursuant to Ohio Revised Code * * * Section 4123.93 and Ohio Revised Code Section 4123.91 and specifically subsection (H) of that with respect to her testimony and whether Mr. Ross was—is going to be required to pay a portion of the amounts back to the Bureau of Workers' Compensation based on in part the amount of bills that were paid; the amount of bills that are expected to be paid; the amount of the permanent partial award, tying all that in with the amount of the jury verdict.

{¶ 23} "And that's what she was going to testify to."

{¶ 24} By proffering the exhibit and proposed testimony of Leuchtag, Ross preserved this issue for review.

{¶ 25} **Subrogation of Workers' Compensation Benefits**

{¶ 26} R.C. 4123.931 provides as follows:

{¶ 27} "(A) The payment of compensation or benefits pursuant to this chapter or Chapter 4121., 4127., or 4131., of the Revised Code creates a right of recovery in favor of a statutory subrogee against a third party, and the statutory subrogee is subrogated to the rights of a claimant against that third party. The net amount recovered is subject to a statutory subrogee's right of recovery.

{¶ 28} " * * *

{¶ 29} "(D) When a claimant's action against a third party proceeds to trial and damages are awarded, both of the following apply:

{¶ 30} "(1) The claimant shall receive an amount equal to the uncompensated damages divided by the sum of the subrogation interest plus the uncompensated damages, multiplied by the net amount recovered, and the statutory subrogee shall receive an amount equal to the subrogation interest divided by the sum of the subrogation interest plus the uncompensated damages, multiplied by the net amount recovered.

{¶ 31} "(2) The court in a nonjury action shall make findings of fact, and the jury in a jury action shall return a general verdict accompanied by answers to interrogatories that specify the following:

{¶ 32} "(a) The total amount of the compensatory damages;

{¶ 33} "(b) The portion of the compensatory damages specified pursuant to division (D)(2)(a) of this section that represents economic loss;

{¶ 34} "(c) The portion of the compensatory damages specified pursuant to division (D)(2)(a) of this section that represents noneconomic loss.

{¶ 35} " * * *

{¶ 36} "(H) The right of subrogation under this chapter is automatic, regardless of whether a statutory subrogee is joined as a party in an action by a claimant against a third party. A statutory subrogee may assert its subrogation rights through correspondence with the claimant and the third party or their legal representatives. A statutory subrogee may institute and pursue legal proceedings against a third party either by itself or in conjunction with a claimant. If a statutory subrogee institutes legal proceedings against a third party, the statutory subrogee shall provide notice of that fact to the claimant. If the statutory subrogee joins the claimant as a necessary party, or if the claimant elects to participate in the proceedings as a party, the claimant may present the claimant's case first if the matter proceeds to trial. If a claimant disputes the validity or amount of an asserted subrogation interest, the claimant shall join the statutory subrogee as a necessary party to the action against the third party."

{¶ 37} In addition, R.C. 4123.93 provides:

{¶ 38} "(D) 'Subrogation interest' includes past, present, and estimated future payments of compensation, medical benefits, rehabilitation costs, or death benefits, and any other costs or expenses paid to or on behalf of the claimant by the statutory subrogee pursuant to this chapter or Chapter 4121., 4127., or 4131. of the Revised Code."

{¶ 39} Thus, the bureau had a subrogation interest in the payments it made to and on behalf of Ross, including the permanent partial award, as well as the estimated future payments. Nappier cites R.C. 4123.931(B) for the proposition that there is an exception to the compensation formula, as the parties could agree to any "fair and reasonable" amount. R.C. 4123.931(B) concerns settlement agreements between the claimant and a third party and is, therefore, not applicable to the case sub judice. R.C. 4123.931(D), which concerns an award of damages following a jury trial, does not contain a similar provision.

{¶ 40} In support of his argument, Ross cites R.C. 4123.95, which provides that the workers' compensation statutes are to be liberally construed in favor of employees. It is important to note that the bureau was not a party to this action, and Ross has not demonstrated how this statute would be applicable in a trial between a claimant and a third party.

{¶ 41} But our analysis does not end here, as the real issue is not one of statutory interpretation, but whether evidence of a third party's subrogation interest, which is generally inadmissible, should have been admitted in this case due to the special and unusual circumstances that occurred in this matter.

**{¶ 42} When Evidence of Workers' Compensation Permeates the Proceedings**

{¶ 43} The underlying purpose of the collateral-source rule is to prohibit the introduction of evidence that a plaintiff's medical expenses have been paid by a third party. However, the record before us is saturated with evidence of workers' compensation interjected by both parties. Thus, the trial court faced a vexing set of circumstances, which turned the routine into the extraordinary and presented difficult challenges regarding admissibility of certain evidence, as well as in crafting a jury charge as to damages.

{¶ 44} On cross-examination, Ross testified regarding another industrial injury he sustained in 2008, in which he was assaulted in the NAPA parking lot. After seeking immediate treatment for these injuries at an urgent-care facility, Ross followed up with Dr. Morley. Upon cross-examination by defense counsel, Ross explained why he saw Dr. Morley for the injuries resulting from the attack. Ross testified that he saw Dr. Morley "because it happened at work. It was another workmans comp claim, yes. They needed a workmans comp doctor."

{¶ 45} During Dr. Morley's testimony, in response to a question by defense counsel, he answered that the "overwhelming majority" of his medical practice concerned workers' compensation claims. Also, he testified that he recommended Ross for a pain-management consult, but it was denied by the bureau. In addition, the following colloquy occurred:

{¶ 46} "Q. Okay. Now counsel referred to a report by Dr. Caufield regarding, apparently regarding carpel tunnel syndrome and the Bureau of Workers' Compensation.

{¶ 47} "Do you know whether, ultimately whether the claim was allowed for bilateral carpal tunnel syndrome as a result of this collision in this case?

{¶ 48} "[Dr. Morley]: Yes. Basically, Dr. Caufield was paid by the Bureau to give his opinions. He basically said there's essentially nothing wrong with [Ross.] It went to a hearing and they didn't believe him.

{¶ 49} "Q. Okay. So was this then allowed?

{¶ 50} "A. It was allowed."

{¶ 51} The trial court admitted plaintiff's Exhibits 3 and 5. Both of these documents contain the acronym for the bureau, "OBWC," in their titles. Moreover, when these documents are examined, it is readily apparent what the documents contain, i.e., medical payments made by the bureau on behalf of Ross.

{¶ 52} During defense counsel's closing argument, workers' compensation is mentioned several times. Specifically, defense counsel repeatedly emphasized

the fact that the majority of Dr. Morley's medical practice involves patients who are submitting workers' compensation claims.

{¶ 53} Also, defense counsel stated:

{¶ 54} "When you look at Doctor Morley's records, ladies and gentlemen, and you hear his testimony, Doctor Morley is comfortable treating [Ross] over and over again because that's what Doctor Morley does. He's a doctor that works for the Bureau of Worker's Compensation or people making Worker's Compensation claims and is content to have a patient for life."

{¶ 55} Finally, the trial court instructed the jury that they were not to consider whether the bureau paid any medical bills on behalf of Ross and further, that they were to assume that Ross would be ultimately responsible for payment of the bills that had already been paid by the bureau.

{¶ 56} Since the record in this matter was saturated with evidence offered by both parties regarding workers' compensation, the trial court should have permitted Ross to introduce evidence regarding subrogation. By refusing to admit this evidence, the jury was presented with a partial, incomplete picture. The jury was well aware that Ross received workers' compensation benefits; however, it was not informed of Ross's statutory obligation to repay those amounts. Thus, this incomplete calculus invited prejudicial speculation and confusion and may have led to a reduced award based upon an assumption that Ross had already received the benefit of having certain medical expenses paid by the bureau. Certainly, juror confusion is demonstrated in the record, as will be discussed below.

{¶ 57} We start with the long-standing collateral-source rule.

{¶ 58} "[B]enefits received by an injured party from a source wholly independent of the wrongdoer are not deductible from the amount of damages he might otherwise recover from the wrongdoer. Proof of an injured party's receipt of such benefits is generally regarded as inadmissible *because of the influence it could have upon the jury in determining the insured party's recoverable damages.*" (Emphasis added.) *Jarrell v. Woodland Mfg. Co.* (1982), 7 Ohio App.3d 320, 323, 7 OBR 416, 455 N.E.2d 1015.

{¶ 59} Evidence of collateral benefits is generally excluded because, as the Supreme Court of Ohio in *Pryor v. Webber* held, a trial court errs to the prejudice of the plaintiff by permitting the plaintiff to be cross-examined regarding receipt of collateral benefits because "[t]he receipt of collateral benefits by the plaintiff was *irrelevant on the issue of damages.*" (Emphasis added.) *Pryor v. Webber*, 23 Ohio St.2d at 115, 52 O.O.2d 395, 263 N.E.2d 235.

{¶ 60} But then comes the *Robinson v. Bates* decision, 112 Ohio St.3d 17, 2006-Ohio-6362, 857 N.E.2d 1195, and the traditional rules are altered. Now, litigants are forced to navigate an uncertain and complex procedure when presented with a case where the injured party received collateral benefits from a third party.

{¶ 61} ***Robinson v. Bates***

{¶ 62} In 2006, the Supreme Court of Ohio released its decision in *Robinson v. Bates,* 112 Ohio St.3d 17, 2006-Ohio-6362, 857 N.E.2d 1195. The court held that "[b]oth an original medical bill rendered and the amount accepted as full payment are admissible to prove the reasonableness and necessity of charges rendered for medical and hospital care." Id. at paragraph one of the syllabus. The court explained its rationale for this rule as follows:

{¶ 63} "To avoid the creation of separate categories of plaintiffs based on individual insurance coverage, we decline to adopt a categorical rule. Because different insurance arrangements exist, the fairest approach is to make the defendant liable for the reasonable value of plaintiff's medical treatment. Due to the realities of today's insurance and reimbursement system, in any given case, that determination is not necessarily the amount of the original bill or the amount paid. Instead, the reasonable value of the medical services is a matter for the jury to determine from all relevant evidence. Both the original medical bill rendered and the amount accepted as full payment are admissible to prove the reasonableness and necessity of charges rendered for medical and hospital care.

{¶ 64} "The jury may decide that the reasonable value of medical care is the amount originally billed, the amount the medical provider accepted as payment, or some amount in between. Any difference between the original amount of a medical bill and the amount accepted as the bill's full payment is not a 'benefit' under the collateral-source rule because it is not a payment, but both the original bill and the amount accepted are evidence relevant to the reasonable value of medical expenses." Id. at ¶ 17–18.

{¶ 65} It appears that the court and the parties in this matter attempted to join the analysis of *Robinson v. Bates* with the objectives of the collateral-source statute codified in R.C. 2315.20 (which was not applicable to this case, as the accident occurred before the effective date of the statute) and to apply both in this case. But such a joinder and application cannot stand the tests of law or logic, as it has been observed as follows:

{¶ 66} "By allowing evidence of the amount accepted as full payment by a collateral source rule, the *Robinson* Court was clearly permitting the introduction of 'evidence of any amount payable as a benefit to the plaintiff' by a collateral source. And yet, R.C. § 2315.20 now renders inadmissible 'evidence of any amount payable as a benefit to the plaintiff' whenever the collateral source has a

right of subrogation. The rules set forth in Robinson and § 2315.20 are therefore in direct conflict and cannot be reconciled." Hanson, Ohio's Collateral Source Rule Following *Robinson v. Bates* and the Enactment of Ohio Revised Code Section 2315.20 (2009), 40 U.Tol.L.Rev. 711, at 755, fn. 362.

{¶ 67} In this matter, the apparent confusion between the distinct concepts addressed in the *Robinson v. Bates* decision, 112 Ohio St.3d 17, 2006-Ohio-6362, 857 N.E.2d 1195, and R.C. 2315.20 resulted in the jury being presented with a conundrum, and the resultant confusion is apparent from the record and the verdict.

{¶ 68} It should be noted that we would be facing the same problem even if the trial court and the parties considered and employed the collateral-source rule and not the statute in this case.

{¶ 69} Faced with both a record that is replete with collateral-source evidence and the *Pryor* decision, 23 Ohio St.2d 104, 52 O.O.2d 395, 263 N.E.2d 235, which "indicates that the admission of evidence in violation of the collateral source rule by its nature prejudices the jury and can be cured by requiring a new trial," *Thompson v. Shaffer* (Sept. 30, 1991), 11th Dist. No. 90–T–4469, 1991 WL 206626, *2, we conclude that the trial court abused its discretion by not also admitting evidence as to the bureau's subrogation rights to off set the prejudicial effect of the collateral-source evidence.

{¶ 70} **Stipulation**

{¶ 71} It is important to note at the outset that the parties in *Robinson*, 112 Ohio St.3d 17, 2006-Ohio-6362, 857 N.E.2d 1195, stipulated to what the difference was between the amount of the billed medical expenses and the amount accepted as full payment. This amount is commonly referred to as the "write-off" amount. In the instant matter, however, the parties appeared to have stipulated that the reasonable value of Ross's medical expenses was $12,057.80.[5] It is clear though that this is the amount the bureau actually paid to the providers. The purpose of this stipulation may have been to avoid the dilemma of arguing two different sets of medical-expense totals to the jury, but both sets of numbers were indeed presented to the jury.

{¶ 72} Despite this stipulation, during the defendant's closing argument, Nappier's counsel argued that this entire amount was not "reasonable." During closing argument, defense counsel began to question the portion of the $12,057.80 that related to reimbursement for medical expenses of treatment provided by Dr. Morley. Defense counsel continued, stating:

---

5. There was no written stipulation; thus, we are left to extrapolate from a confusing in-camera discussion regarding this number.

{¶ 73} "Doctor Smith [the defense medical expert] indicated to you about a third of those bills would be reasonable. When you take out the other two-thirds you come down to about $6,000 of that $12,057 and 80 cents; *that's what's reasonable; that's what the evidence shows is warranted,* ladies and gentlemen." (Emphasis added.)

{¶ 74} Thus, Nappier "stipulated" to the reasonable cost of necessary hospital and medical expenses at $12,057.80, but then argued that only a fraction of those expenses was reasonable. This rendered the stipulation entirely meaningless. Following this strategy, a defendant could "stipulate" that the reasonable value of the plaintiff's medical expenses was $1,000,000, and then argue that only $500 of the plaintiff's medical expenses were actually reasonable, thereby "sandbagging" the plaintiff, who had agreed to a stipulation and, as a result of the stipulation, did not present other evidence related to the reasonable value of those expenses.

{¶ 75} In addition to rendering the stipulation meaningless and confusing, this trial tactic is problematic because the defendant "stipulates" to medical expenses he or she does not believe are related to the injuries proximately caused by the defendant's negligence. If the medical expenses were not related to injuries proximately caused by the defendant's negligence, they would not be admissible, since they would not be relevant. See, e.g., Evid.R. 401.

{¶ 76} In this matter, the "stipulation," when combined with a modified *Robinson* jury instruction that charged that the jury could consider only the amount that the medical providers accepted as full payment (without the added element of the Ohio Jury Instructions pattern charge that this amount "may be considered along with all other evidence") and from that was asked to determine the reasonable cost of necessary medical expense proximately caused by the defendant's negligence, followed by a form of an insurance or subrogation jury instruction, as discussed below, had the effect of confusing the jury and prejudicing Ross. See 3 Ohio Jury Instructions (2009), Section 315.01.

{¶ 77} The court in *Robinson* was concerned with the reasonable value of the injured party's medical expenses. It framed the issue by first considering "what evidence a jury may consider in evaluating the reasonable value of medical expenses." *Robinson v. Bates,* 112 Ohio St.3d 17, 2006-Ohio-6362, 857 N.E.2d 1195, at ¶ 7. As previously noted, the dispute in *Robinson* was whether evidence of the "write-off" was admissible. The court resolved the dispute by allowing evidence of both the original bills and the amount accepted as payment in full to go to the jury, asserting that both amounts are evidence relevant to the reasonable value of medical expenses. Id. at syllabus. It is beyond dispute that the majority in *Robinson* found that the collateral-source rule does not bar the introduction of evidence of the "write-off" amount. Id. at ¶ 16. But Justice Lundberg Stratton opined that she did not "view this as a collateral-source issue,"

id. at ¶ 32 (Lundberg Stratton, J., concurring in part and dissenting in part); and rightly so, because as the court held in *Pryor*, receipt of benefits is irrelevant on the issue of damages. *Pryor v. Webber*, 23 Ohio St.2d at 109, 52 O.O.2d 395, 263 N.E.2d 235.

{¶ 78} But in Ross's case, the jury was presented with a stipulation of the "amount" of the medical services, but not a true stipulation that the amount stated was an agreed amount as to the "reasonable value of the medical expenses." At the same time, the jury was presented with itemized bills that reflected the amount billed and the amount allowed by a collateral source—the bureau (or the "Robinson numbers" as described by the trial court). The jury was then charged that "in order to determine a reasonable cost of necessary medical and hospital expenses incurred you may consider the amount that the medical providers accepted as full payment for the services received by Mr. Ross." The confusion created by this conflicting information was exacerbated by the fact that it was patently apparent to the jury from the exhibits and the testimony that the bureau paid these bills on behalf of Ross. This puzzle was missing a critical piece. What the jury did not hear was that Ross was statutorily obligated to repay the bureau.

{¶ 79} The confusion and prejudice created by allowing the jury to consider the amount billed, the amount allowed, and the fact that a third-party paid the allowed amount without learning that Ross had to pay back a portion of the allowed amount was foreshadowed by Justice Lundberg Stratton's concurring and dissenting opinion in *Robinson*. Justice Lundberg Stratton wrote:

{¶ 80} "The majority's decision creates confusion by creating a grey area for judges instructing juries in considering medical damages. The majority holds the defendant liable for the 'reasonable value of plaintiff's medical treatment' but gives no direction as to what that means—how does the jury weigh the amount billed, the amount paid, or 'some amount in between'? What are the factors they may use to consider this issue?" *Robinson v. Bates*, 112 Ohio St.3d 17, 2006-Ohio-6362, 857 N.E.2d 1195, at ¶ 31 (Lundberg Stratton, J., concurring in part and dissenting in part).

{¶ 81} With the confluence in this case of a personal-injury claim arising out of an accident that was also covered by workers' compensation, the bureau's right of subrogation, and the majority's decision in *Robinson*, which, in one decision, appears to both reaffirm the collateral-source rule in principle but eradicate it in practice, the trial court and counsel were left to guess what path to follow regarding admissibility of subrogation evidence and a charge on damages.

{¶ 82} **Applicability of Ohio's Collateral Source Statute, R.C. 2315.20**

{¶ 83} In his appellate brief, Ross asserts that "[t]here is no limit under [R.C. 4123.931] to the claimant's right to present the evidence of all of the consequences caused by a tortfeasor's negligent conduct, including the amount to which the BWC is statutorily subrogated."

{¶ 84} In response, Nappier cites R.C. 2315.20, which provides:

{¶ 85} "(A) In any tort action, the defendant may introduce evidence of any amount payable as a benefit to the plaintiff as a result of the damages that result from an injury, death, or loss to person or property that is the subject of the claim upon which the action is based, except if the source of collateral benefits has a mandatory self-effectuating federal right of subrogation, a contractual right of subrogation, or *a statutory right of subrogation* or if the source pays the plaintiff a benefit that is in the form of a life insurance payment or a disability payment. However, evidence of the life insurance payment or disability payment may be introduced if the plaintiff's employer paid for the life insurance or disability policy, and the employer is a defendant in the tort action." (Emphasis added.)

{¶ 86} Ross's accident occurred on March 31, 2005. The effective date of the collateral-source statute, R.C. 2315.20, was April 7, 2005. Since R.C. 2315.20 became effective after the cause of action occurred, the statute does not apply to this case. See *Jaques v. Manton*, 6th Dist. No. L–08–1096, 2009-Ohio-1468, 2009 WL 806858, at ¶ 7, fn. 1, quoting *Robinson v. Bates*, 112 Ohio St.3d 17, 2006-Ohio-6362, 857 N.E.2d 1195, at ¶ 10, fn. 1. In *Robinson*, the Supreme Court of Ohio held that R.C. 2315.20 did not apply in the case under consideration, "because it became effective after the cause of action accrued and after the complaint was filed." *Robinson* at ¶ 10, fn. 1. In construing the *Robinson v. Bates* holding, the Tenth Appellate District has held that R.C. 2315.20 did not apply to a cause of action that accrued prior to the effective date of the statute. *Salvatore v. Findley*, 10th Dist. No. 07AP–793, 2008-Ohio-3294, 2008 WL 2588547, at ¶ 13.

{¶ 87} We note the following language from the Supreme Court of Ohio regarding the traditional purpose of the collateral-source rule:

{¶ 88} "[U]nder the collateral-source rule, the plaintiff's receipt of benefits from sources other than the wrongdoer is deemed irrelevant and immaterial on the issue of damages. * * * The rule prevents the jury from learning about a plaintiff's income from a source other that the tortfeasor so that a tortfeasor is not given an advantage from third-party payments to the plaintiff. * * *" *Robinson v. Bates*, 112 Ohio St.3d 17, 2006-Ohio-6362, 857 N.E.2d 1195, at ¶ 11.

{¶ 89} However, in this matter, Ross attempted to introduce that evidence as the plaintiff. Since the collateral-source statute is designed to protect the

plaintiff, R.C. 2315.20, in any event, does not prohibit the introduction of the proffered evidence by the plaintiff.

{¶ 90} As we observed, *Robinson* stands for the confusing proposition that the "collateral-source rule does not apply to write-offs of expenses that are never paid" as those write-offs differ "from the receipt of compensation or services addressed in *Pryor* * * * [b]ecause no one pays the write-off, it cannot possible constitute *payment* of any benefit from a collateral source." (Emphasis sic.) *Robinson* at ¶ 16.

{¶ 91} The majority's analysis in *Robinson* was not only confusing but incomplete. First, the proposition that a "write-off" is not a "benefit" ignores the practical realities of the health-insurance industry and Ohio's workers' compensation system. The write-off arises because there is coverage via a health insurance plan or some form of benefits. Without coverage, there would be no write-off. The medical providers are not accepting a reduced amount to be charitable. Second, the *Robinson* majority apparently failed to consider the practical effects of their decision.

{¶ 92} After *Robinson,* a jury may learn of the amount of medical charges billed, the amount actually paid, and the amount of the "write-off." From those numbers and consideration of all the evidence submitted, the jury may "decide that the reasonable value of the medical care is the amount originally billed, the amount the medical provider accepted as payment, or some amount in between." *Robinson,* 112 Ohio St.3d 17, 2006-Ohio-6362, 857 N.E.2d 1195, at ¶ 18. The jury may also learn (or most jurors will certainly speculate) that a third-party plan paid the bill. What the jury will not learn is that the injured plaintiff is contractually or statutorily liable to repay the amount paid in whole or in part. By failing to address this reality, the court set the stage for exactly what occurred in this case—the introduction of evidence of "write-offs" *and* the introduction of evidence that a collateral source paid the bills. This evidence negatively affects the amount of damages recoverable and results in unfair prejudice to the injured party. While the court did give an instruction that the jury was not to consider that the bureau paid the bills and then attempted to further clarify this instruction, the fact of the matter remained that the jury had before it a reduced amount of bills without the balancing or leveling evidence that the bureau must be repaid a portion of its payments from the jury award.

{¶ 93} The collateral-source rule prohibits the introduction of evidence of insurance or other benefits. It was designed to protect the plaintiff from having to inform the jury that some or all of his expenses were paid by another, thus giving the tortfeasor a windfall.

{¶ 94} Because of the *Robinson* decision, the court and the parties in this case felt compelled to introduce the *"Robinson* numbers," i.e., the amount billed and the amount accepted. The jury heard throughout the trial that Ross was covered by workers' compensation for his injuries, wage loss, and medical expenses; thus, the protection of the collateral-source rule was lost to Ross. Because the jury was told to ignore the fact that the bureau paid the bills, the tortfeasor was not only given the benefit of the payments made by the bureau, she was in effect given a "double windfall" as the amount of the special damages the jury had to consider was reduced and the jury never learned that Ross has a statutory obligation to repay a portion of those payments out of any award.

{¶ 95} **Evid.R. 403(A)**

{¶ 96} In her motion in limine, Nappier cites Evid.R. 403(A) as grounds for preclusion of the proffered evidence. This rule provides:

{¶ 97} "Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury."

{¶ 98} In this matter, it appears that the trial court did not want to mislead the jury by admitting evidence relating to subrogation, but the confusion created by the *Robinson* decision as applied in this case did exactly that, as is apparent from the discussion with counsel concerning the introduction of the bureau's subrogation interest:

{¶ 99} "But the alternative to that is then to get into that whole subrogation issue and what percentage does he have to pay. I mean, we all realize it's a legal fiction."

{¶ 100} The true legal fiction here is that the jury was told to ignore evidence that the bureau paid bills and compensation and to further assume that the bills would be paid by Ross while, at the same time, being told to also assume that Nappier was responsible for that sum.

{¶ 101} As Professor Giannelli observed, "Rule 403 comes into play only if the evidence is prejudicial in the sense that the jury cannot properly evaluate it." Giannelli & Snyder, Evidence (2d.Ed.2001) 403.5. In this case, the evidence the trial court excluded was necessary for the jury to properly and completely consider and determine damages.

{¶ 102} **Jury instructions**

{¶ 103} The pattern jury instruction relating to evidence of the value of medical expenses post-*Robinson* provides:

{¶ 104} "In determining the reasonable value of medical, hospital or other related care, treatment, services, products or accommodations you shall consider

all of the evidence submitted. Both the original bill and the amount accepted as full payment may be considered along with all other evidence to determine the reasonable value." 3 Ohio Jury Instructions (2009), Section 315.01.

{¶ 105} The trial court instructed the jury as follows:

{¶ 106} "In order to determine a reasonable cost of necessary medical and hospital expenses incurred you may consider the amount that the medical providers accepted as full payment for the services received by Mr. Ross. After consideration of the amount accepted by the medical providers, you will determine the reasonable cost of necessary medical and hospital expenses proximately caused by the negligence of defendant, Kristen Nappier. The parties have agreed that the total amount of the bills for medical and hospital expenses is $12,057 and 80 cents.

{¶ 107} "In determining whether to award a sum of money to plaintiff, Gilbert Ross, you may not consider whether an insurer, the Bureau of Workers' Compensation or any third party paid or will pay any of the bills, costs, expenses or damages associated with plaintiff's claims.

{¶ 108} "In other words you are instructed to assume that any expenses including medical and hospital expenses incurred by the plaintiff have been or will be paid by the plaintiff. Likewise, you are also to assume that if the sum of money is awarded to the plaintiff, the defendant, not an insurer, not the Bureau of Workers' Compensation, or any third party is responsible for that sum of money."

{¶ 109} There are two problems with the trial court's jury instruction. First, the trial court omitted the phrase from the Ohio Jury Instruction "*Robinson*" charge that the jury "shall consider all of the evidence submitted" in determining the reasonable value of Ross's medical care. Instead, the trial court instructed the jury only that it was to consider the amount accepted as full payment by the medical providers. Thus, in essence, the trial court gave a "modified" *Robinson* charge.

{¶ 110} Second, the trial court instructed the jury that it was not to consider whether the bureau paid any of Ross's medical expenses and that they were to assume Ross was or would be ultimately responsible for his medical expenses. Essentially, the trial court instructed the jury on subrogation. However, by giving this instruction without permitting the evidence of the bureau's subrogation claim, the jury was placed in an untenable position, in that they were asked to ignore certain evidence and make presumptions that were not supported by the evidence. Had the jury heard evidence regarding Ross's statutory obligation to repay these amounts as a result of the bureau's subrogation interest, the jury would have been able to better understand and follow the trial court's instructions.

**{¶ 111} Juror Confusion**

{¶ 112} The trial court sought to limit juror confusion by excluding evidence of subrogation. However, the meaningless "stipulation," the admission of significant other evidence of workers' compensation benefits, and the jury instructions on damages given by the trial court had the opposite effect. Evidence of the juror confusion is contained in the record, which we cannot ignore.

{¶ 113} After the jury returned its verdict, the court had a discussion with the jurors regarding their experience, a discussion that was off the record. Thereafter, the attorneys returned to the courtroom, and there was a discussion held on the record. The following discussion occurred:

{¶ 114} "[The trial court]: So we'll start with the jurors, and feel free to make your comments about the medical bills whoever wishes to lead off. I'm going to call on one of you if you don't. We'll start with the foreperson, Mr. Florkiewicz. What would you have preferred to have seen with regard to the medical bills?

{¶ 115} "JUROR 1: I think we wanted to see the defense's number of 18,000—how that was broken down.

{¶ 116} "JUROR 3: It was that we were wanting to see what the emergency room numbers were, the prompt care numbers, the physical therapy, and then possibly—and then I know there were some drugs or prescriptions in there too that was spelled out.

{¶ 117} "But I think if we would have had those numbers more lumped we could have kind of figured what we thought was a length of time that was a reasonable length of time for the medical part of it."

{¶ 118} This colloquy demonstrates that the jury was confused, in that they expected to see additional medical evidence—despite the fact that the parties "stipulated" to the value of Ross's medical expenses.

**{¶ 119} Conclusion**

{¶ 120} Based on the unique facts and circumstances of this case, we conclude that the trial court abused its discretion by granting Nappier's motion in limine and excluding the evidence of the bureau's subrogation interest.

{¶ 121} Ross's assignment of error has merit.

{¶ 122} The judgment of the Geauga County Court of Common Pleas is reversed, and this matter is remanded to the Geauga County Court of Common Pleas for further proceedings and a new trial consistent with this opinion.

Judgment reversed<br>and cause remanded.

RICE and O'TOOLE, JJ., concur.